# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **BENJAMIN MUMAW, ET AL.,** | ) | **CASE NO.1:13CV1048** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **THISTLEDOWN RACETRACK, LLC** | ) | <u>**OPINION AND ORDER**</u> |
| **ET AL.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**CHRISTOPHER A. BOYKO, J:**</u>

This matter is before the Court on the Motions for Summary Judgment of Defendants Phillip Gore, Daryl Parker and Joseph DeLuca (ECF # 134), Thistledown Racetrack, LLC (ECF # 142) and Deborah Jones (ECF # 136). For the following reasons, the Court grants summary judgment for Defendants on all Plaintiffs' claims.

## <u>Plaintiffs' Claims</u>

Plaintiffs, Benjamin Mumaw and Joshua Mumaw, are Ohio residents and members of a father/son operation that breeds and trains racehorses and Plaintiff, Eyes of a Child Stables, is a racing consortium and registered partnership in the State of Ohio. In this action, they seek monetary damages and injunctive relief against Defendants.

The Ohio State Racing Commission ("OSRC") is a statutorily created Ohio agency charged with the regulation, supervision and rule enforcement for Thoroughbred and Standardbred horse racing in the State of Ohio. The Commission vests its authority regarding horse racing, participants, personnel and activities involved in horse racing in a Board of Stewards. On November 8, 2012, the Board of Stewards at Thistledown Racetrack, under the Commission's authority, withdrew Plaintiffs' horse, *Officer Moo La Moo*, from a race. Plaintiffs' horse was withdrawn following Defendant Deborah Jones's communication alleging that Plaintiffs had a horse at Sugar Creek Livestock Auction, which is known to sell horses to slaughterhouses. The Board of Stewards also suspended Plaintiffs' track privileges for the balance of 2012 and, after a later hearing, permanently barred them from entry due to a subsequent purported violation.

Although selling and purchasing horses at auction for the purpose of slaughter violates no state or federal laws, the Thistledown Stall Application, a boarding agreement, prohibits parties who stable horses at Thistledown from transporting race horses either directly or indirectly to a slaughterhouse or an auction house that sells horses for slaughter. Plaintiff Joshua Mumaw was the recorded owner of the race horse, *High Success*, when it was sold at Sugar Creek Livestock Auction. Plaintiffs claim, however, that the horse had been given to "a woman," and deny any part in or knowledge of the horse being at auction.

Plaintiffs' Second Amended Complaint alleges Thistledown impermissibly prevented them from racing horses that were already entered in races and ejected and excluded Plaintiffs from Thistledown Racetrack without cause or inquiry. Plaintiffs allege these actions by Thistledown deprived Plaintiffs of their occupation and ability to make a living and

essentially bars Plaintiffs from participating in Thoroughbred Racing.

Plaintiffs further allege Thistledown defamed Plaintiffs and cast them in a false light by advertising to the world that Plaintiffs engaged in selling a horse to a slaughterhouse when Plaintiffs had not.

Plaintiffs seek Declaratory Relief asking the Court to find paragraph 7 of the Thistledown Stall Agreement, prohibiting Thistledown boarders from transporting horses to slaughterhouses, as unenforceable as against public policy.

Plaintiffs' Second Amended Complaint ("SAC") further alleges deprivations of Plaintiffs' constitutional rights brought under 42 U.S.C. § 1983 against Stewards Phillip Gore, Jr., Daryl Parker and Joseph DeLuca in their official and individual capacities for due process violations. Plaintiffs seek monetary damages and injunctive relief on these claims. Lastly, Plaintiffs assert Defamation and False Light claims against Defendant Deborah Jones for falsely publishing Plaintiffs alleged involvement in the transfer of *High Success* to an auction house known to sell horses to slaughterhouses.

During the course of the litigation and motion practice, claims against the Ohio State Racing Commission, William Crawford, Richard Kinsey, Joel McCullar and Richard Garrison have all been dismissed, (See ECF #'s 57, 86,87), as well as certain claims against Thistledown and Deborah Jones. (See ECF #'s 87 and 90).

**<u>Facts Concerning the Claims Against Remaining Defendants</u>**

Plaintiff Joshua Mumaw purchased a horse by the name of *High Success*. After a race at Defendant Thistledown, a veterinarian diagnosed the horse with a knee injury rendering the horse unable to race again. Plaintiff Benjamin Mumaw alleges that he knew a woman by the

name of "Janet" or "Janice" that he met at the Damascus Livestock Auction, who had been asking him for months for a horse for her children. He then relayed that information to Plaintiff Joshua Mumaw who gave the woman the horse when she arrived, sometime in late October of 2012. Plaintiff Joshua Mumaw alleged he was in a hurry and did not get a bill of sale from the new owner or transfer the horse's paperwork. Plaintiff Joshua Mumaw apparently kept the horse's paperwork without indicating a sale or transfer of ownership. Plaintiffs allege that a few weeks later they received a call from Defendant Deborah Jones stating that *High Success* had been found at an auction house known as Sugar Creek, a place generally known to sell horses for slaughter. Plaintiffs question the veracity of Defendant Jones' allegation. Plaintiffs also allege that Defendant Jones asked for $1,000 for horse care in return for "good publicity."

In early November, Plaintiffs approached Defendant Thistledown to inform them of the situation. Sometime after, Plaintiff Joshua Mumaw sent Defendant Jones a check for $500. On November 1, 2012, an article in the New York Times appeared about Defendant Jones and her efforts to rescue racehorses. The article makes no mention of any Plaintiff or Defendant in this case, only one unrelated horse. It does mention, without explicitly naming Sugar Creek, as an Ohio "kill pen" from which eight horses were rescued. The article also mentions one horse by name (not belonging to Plaintiffs), but interested parties could, in theory, research where those horses had raced.

Plaintiffs allege that Defendant Jones found the $500 payment insufficient and she therefore called Defendant Thistledown to communicate that a horse under the ownership of Plaintiffs had been found at the "kill pen." On November 8, 2012, a Board of Stewards

consisting of Richard Kinsey, Joel McCullar and Phillip Gore (Board of Stewards I) at Thistledown Racetrack under the Commission's authority, withdrew Plaintiffs' horse, *Officer Moo La Moo*, from a race.  Plaintiffs allege that they were suspended for the remaining ten days of the racing season.  Plaintiffs allege that this was done in violation of the Stall Application agreement with Defendant Thistledown, specifically a clause  that indicates that the purpose of the contract is to "encourage" trainers and owners to race at Thistledown.  The contract further states that owners "should maintain a 1- 1.5 starts per stall per month..."

Plaintiffs allege that they were banned from racing at Defendant Thistledown for the 2013 racing season because of the situation with *High Success* and Defendant Jones' comments.  Furthermore, they allege that they were indefinitely suspended from Mahoning Valley Racetrack, though not until 2016.  During the 2013 season, Plaintiff Benjamin Mumaw was suspended by the OSRC for utilizing a third party to race his horses at Defendant Thistledown, despite his previous suspension.  This Board of Stewards, (Board of Stewards II) decision was made by Defendant Stewards Garrison, DeLuca and Parker.  As a result, Plaintiff Benjamin Mumaw was fined $1,000 and suspended for one year.

## Law and Analysis

Summary judgment shall be granted only if  "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed.R.Civ.P. 56(a).  The burden is on the moving party to conclusively show no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy. Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).  The moving party must either point to "particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed.R.Civ.P. 56(c)(1)(A), (B). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact. *Betkerur v. Aultman Hospital Ass 'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404-06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986); and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distributors Benefits Ass 'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

**Gore, Parker and DeLuca**

Plaintiffs allege Gore engaged in an unlawful taking in violation of Plaintiffs' constitutional rights when the Stewards scratched *Officer Moo La Moo* from a race without first providing a pre-deprivation hearing or providing a post-deprivation hearing. Plaintiffs have sued Gore in his official and individual capacities. Plaintiffs further allege Defendants Parker and DeLuca violated their due process rights when they suspended Plaintiffs for racing horses under fictitious owners in 2013. Defendants argue any official capacity claims against them are barred by the Eleventh Amendment.

Plaintiff concedes his § 1983 claims against all the Steward Defendants in their official capacity are barred (subject to appeal) by the Eleventh Amendment for the reasons cited by the Court in the Court's previous decision of March 26, 2015 at ECF # 86. There, the Court dismissed Plaintiffs' claims against another Steward based on Eleventh Amendment immunity, failure to state a claim under the *Twombly/Iqbal* standard, and qualified immunity. In finding the Defendant Stewards were entitled to Eleventh Amendment immunity, the Court held:

> "The Eleventh Amendment, as interpreted by the Supreme Court, bars an action for damages in a federal court against a State, unless Congress has abrogated its sovereign immunity or the State has expressly waived it." *Lee Testing & Engineering, Inc. v. Ohio Dept. of Transp.*, 855 F.Supp.2d 722, 725 (S.D.Ohio,2012) citing *Virginia Office for Protection & Advocacy v. Stewart,* ––– U.S. ––––, 131 S.Ct. 1632, 1637–38, (2011). "The same immunity applies to an instrumentality of the state, such as a state official sued in his or her official capacity." *Lee Testing,* 855 F. Supp.2d at 725 citing *Regents of the University of California v. Doe,* 519 U.S. 425, 429 (1997); *see also Ernst v. Rising,* 427 F.3d 351, 358 (6th Cir. 2005). "Suits for money damages against state officials in their official capacity are considered to be suits against the state itself." *Lee Testing*, 855 F. Supp.2d at 725 citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Eleventh Amendment immunity bars claims brought under 42 U.S.C. § 1983 and state law. *Lee Testing*, 855 F.

Supp.2d at 725-726 ("Because state officials are being sued for money damages in their official capacity, the Eleventh Amendment is squarely in play as a bar to suit in federal court, at least to the extent that Plaintiffs are bringing claims under 42 U.S.C. § 1983 (Claim Two) and state law (Claim Three)"). Furthermore, a §1983 action brought against state officials acting in their official capacities fails because such state actors are not "persons" within the meaning of 42 U.S.C. § 1983. See *Will,* 491 U.S. at 62–71. Therefore, Plaintiffs' official capacity claims against Defendants for monetary damages are barred by the Eleventh Amendment.

Plaintiffs agree the same reasoning that the Court relied on in its Opinion and Order dismissing Plaintiffs' claims against Defendants Garrison, Kinsey and McCullar (ECF # 86 and 87), defeats their official capacity claims against all three Defendants and their individual claims against DeLuca and Parker. The Court agrees and adopts its holding in the Opinion and Order regarding the claims against Defendant Garrison with respect to the §1983 claims brought by Plaintiffs against Gore, Parker and DeLuca in their official capacities and with respect to Parker and DeLuca, in their individual capacities. Although a claim for injunctive relief is not barred by the Eleventh Amendment, Plaintiffs' claims fail because, as discussed below, Plaintiffs suffered no deprivation of a constitutional right.

Defendant Gore was a steward who participated in the decision to scratch *Officer Moo La Moo* from a race when it was determined Plaintiffs violated the Stall Application agreement when *High Success* was found at the Sugar Creek auction. Plaintiffs license was not suspended by Gore, nor were Plaintiffs barred from engaging in the racing profession. Patrick Ellsworth, Racing Secretary at Thistledown, testified it was Thistledown that determined *Officer Moo La Moo* would be scratched. (Ellsworth depo. Pg 35-36). When a state actor merely approves the act of a private actor, no state action is implicated. See *Bier v. Fleming*, 717 F.2d 308, 311 (6th Cir. 1983) ("We conclude that the conduct of the racing

officials was not a sufficient exercise of coercive power or significant encouragement on part of the State to find state action in an otherwise private decision. Accordingly, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment."). Because the decision to suspend Plaintiffs' racing privileges was based on Plaintiffs' violation of the Stall Application Agreement, no due process violation occurred.

Stewards DeLuca and Parker were involved in the decision to suspend Plaintiffs Benjamin Mumaw and Eyes of a Child from racing at Thistledown for Plaintiffs' racing horses under fictitious owners. There, Plaintiffs were given a pre-deprivation hearing. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge,* 424 U.S. 319, 333, (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, (1965)). Plaintiffs walked out of the hearing. However, assuming that the Board of Stewards II improperly conducted the initial hearing and issued sanctions, the law is quite clear that Plaintiffs had a right to appeal the Board of Stewards' decision and that such an appeal would have stayed any sanction order. See O.R.C. § 3769.091 ("Any fine or suspension may be appealed to the commission. Such appeal shall stay the fine or suspension until further action by the commission."). As previously stated by the Court in its Order denying Plaintiffs' Motion for Preliminary Injunction, an appeal under O.R.C. § 3769.091 affords the appellant an opportunity for a full hearing before the OSRC, complete with the opportunity to call witnesses and to be represented by counsel. Should the appellant object to the finding of the OSRC, Ohio law permits an appeal to an Ohio court of common pleas and subsequently, the right to appeal to an Ohio appellate court.

In fact, under Ohio law, the Board of Stewards is not required to hold a hearing prior to imposition of sanctions. See *Wager v. Ohio State Racing Comm'n*, No. CA-2885 1992 WL 29209, *3 (Ohio App. Jan. 22, 1992); O.R.C. § 119.06. In *Barry v. Barchi,* (1979) 443 U.S. 55, the United States Supreme Court held that due process did not require a pre-deprivation hearing before suspending a horse trainers horse from racing. The Supreme Court held:

> We do not agree with Barchi's basic contention, however, that an evidentiary hearing was required prior to the effectuation of his suspension. Unquestionably, the magnitude of a trainer's interest in avoiding suspension is substantial; but the State also has an important interest in assuring the integrity of the racing carried on under its auspices. In these circumstances, it seems to us that the State is entitled to impose an interim suspension, pending a prompt judicial or administrative hearing that would definitely determine the issues.

*Id.* at 64.

Here, Ohio law requires any sanction imposed on Plaintiffs by the Board of Stewards II be stayed if Plaintiff appeals. The appeal must be heard by the OSRC within thirty days of the date of the appeal. *Wagers*, at *3. Plaintiffs' due process violation claim fails because the statutory scheme provided in O.R.C. § 3769.091 provides multiple levels of review sufficient to ensure Plaintiffs an opportunity to be heard. Plaintiffs do not allege that an appeal to the OSRC would be futile, nor do they allege that the appeals permitted under the statute do not satisfy due process requirements. Therefore, Plaintiffs cannot assert a lack of due process as a matter of law. In fact, Plaintiffs have appealed and the suspension is stayed. Thus, no deprivation has occurred nor will occur, until all process due Plaintiffs have been exhausted.[1]

---

[1]     The Court previously determined Plaintiffs' due process claims arising out of the Board of Stewards II decision must be dismissed as to Garrison because the Second Amended Complaint failed to allege any facts supporting the due process violation. See ECF # 86. The Court finds this applies to the claims against

Thus, Plaintiffs have not asserted any constitutional violations against Gore in suspending *Officer Moo La Moo* for one race.  Nor have they demonstrated a due process violation by Parker and DeLuca for Plaintiffs' 2013 suspensions as Plaintiffs were afforded, and still may take advantage of sufficient due process.

The Court also finds Defendants are entitled to qualified immunity on Plaintiffs' claims   Here, Plaintiffs have not shown a denial of a constitutional right because, with respect to Gore, the scratching of a horse from one race did not deprive Plaintiffs of a constitutional right, and with respect to DeLuca and Parker, the process given Plaintiffs was sufficient under the law.

Plaintiffs' challenge summary judgment for Gore on their individual capacity claim, contending Gore constructively suspended Plaintiffs' license by scratching *Officer Moo La Moo* from a race without a hearing and refusing to accept any more entries from Plaintiffs and such an action exceeded his authority under Ohio law.

Suits against state officials take two forms.  First, allegations against officials in a personal capacity  "seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  Second, official-capacity suits are essentially lawsuits against the entity that the officials works for and "should be treated as suits against the State." *Id.*  The purpose of § 1983 is to  provide "a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil

---

DeLuca and Parker arising from the Board of Stewards II hearing and finds it also militates against Plaintiffs claims.

11

liberties.  The Eleventh Amendment bars such suits unless the State has waived its

immunity..."  *Will v. Michigan Dept. of State Police*, 491 U.S., 66 (1989).

Officials who perform discretionary functions are generally entitled to qualified

immunity for civil money damages as long as their conduct "does not violate clearly

established statutory or constitutional rights of which a reasonable person would have

known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Where a constitutional violation

has occurred, a court may proceed to determine whether the right in question was so clearly

established at the time of the violation that a reasonable public official in the same position

would have known that he or she was violating that right.  *Wilson v. Layne*, 525 U.S. 603, 609

(1999); *Cherrington v. Skeeter*, 344 F.3d 631, 636 (6th Cir. 2012).  When qualified immunity

is raised as a defense, the plaintiff bears the burden of demonstrating that the defendant is not

entitled to qualified immunity.  *Rodriquez v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011).

The Sixth Circuit uses a three part analysis for qualified immunity.  First, did the plaintiff

show a violation of a constitutionally protected right. *Sample v. Baily*, 409 F.3d 689, 696-97

(6th Cir. 2005).  Second, whether the right was clearly established at the time so that a

reasonable official would understood that his behavior violated that right.  *Id.*  Third, whether

the plaintiff has alleged sufficient facts with sufficient evidence to indicate that what the

official did was objectively unreasonable in light of a plaintiff's clearly established rights.  *Id.*

The Ohio Administrative Code 3769-4-26(C) states:

The stewards may take disciplinary action against any licensee who has
conducted himself/herself in a manner detrimental to the sport of horse racing
by the indiscriminate use of profanity, failure to properly perform their duties
which directly affect the track patrons, the treatment of patrons or other

12

persons on the track premises in a discourteous manner, or by other actions which are found to be generally unacceptable by patrons and/or the stewards.

The Sixth Circuit has ruled that the words 'may' and 'shall have the power to' often indicate sufficient discretion to defeat a plaintiff's allegation of a vested entitlement. *Triomphe Investors v. City of Northwood*, 49 F.3d 198, 203 (6th Cir.1995). (The language "special use permit may be granted in any of the established zoning districts" established a discretionary power in a city council); *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 442 (6th Cir. 2005)("Shall have the power to" established a discretionary power in a benefit plan). A plaintiff "cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002). Plaintiffs have conceded that the individual claims against Defendants DeLuca and Parker are no longer applicable in light of the Court's prior rulings. Even if a constitutional violation occurred, the Court must determine whether Gore is entitled to qualified immunity. The Court holds that he is.

The Court finds that Plaintiffs' theory that their property interest was violated is unsubstantiated. It was well within Gore's discretion to take the action that he did - to scratch a single horse from a single race on the basis of the information he had for the public good. Doing so did not violate a constitutional right of the Plaintiffs. Plaintiffs' argument proceeds on the theory that their license to race was constructively suspended by Gore when in his official capacity, Gore scratched *Officer Moo La Moo* from a single race. Plaintiffs argue that this suspension resulted in an "avalanche" that created "constructive suspension" either by creating an impossible hardship by forcing them to travel to other tracks to race, or causing other tracks to ban them. The Court finds that these allegations are not only conclusory, but

clearly undermined by other evidence.  By all accounts, including Plaintiffs' own deposition,

Plaintiffs were free to race at other Ohio race tracks.   Furthermore, Plaintiffs have provided

no evidence that Gore was involved with Thistledown's decision to reject further entries.  The

evidence indicates this decision was purely a decision by Thistledown and was not

attributable to Gore or the OSRC.  Plaintiffs have not even provided evidence that they were

rejected at all other Ohio race tracks.

Furthermore, Plaintiffs have not cited the Court to any caselaw demonstrating that

Plaintiffs' had a clearly established right not to have their horse scratched from even a single

race.  In the absence of such a clearly established right, Gore is entitled to qualified immunity.

Nor, for the reasons described above, have Plaintiffs demonstrated by competent evidence

that the Stewards actions were unreasonable.  All actions taken by the Stewards were based

on the evidence and in accordance with applicable law.  Thus, Gore's actions have not

violated any constitutional right of Plaintiff.  Having failed to carry the necessary burden of

proof, Plaintiffs' claims against Gore are barred by Gore's qualified immunity.

Nor can Plaintiffs show an impacted liberty interest was affected.  Their licenses were

not affected by either Board's decisions, nor were Plaintiffs barred by the Boards from racing

in Ohio.

Also, Plaintiffs' Abuse of Power Claim fails as a matter of law insofar as it states a

claim under Ohio law because Ohio does not recognize such a claim.  *See Peters v. Ohio*

*Dept. of Natural Res.,* Case No. 03AP-350, 2003 WL 22480395, *4 (Ohio App. Dist 10, Nov.

4, 2003). "However, an abuse of power claim can be brought in federal court as substantive or

procedural due process arguments." *Schwartz v. City of Conneaut,* Ohio, Case No.09 CV

1222, 2009 WL 4730594, 6 (N. D. Ohio, Dec. 8, 2009) *See also Myers v. Delaware County,* Case No. 2–07–cv–844, 2008 WL 4862512, * 9–10, (S. D. Ohio Nov. 7, 2008). "The Sixth Circuit has explained that 'substantive due process prohibits the government's abuse of power or its use for the purpose of oppression, and procedural due process prohibits arbitrary and unfair deprivations of protected life, liberty, or property interests without procedural safeguards.'" *Schwartz at 6, Myers* at *4 ( *quoting Howard v. Grinage,* 82 F.3d 1343, 1350 (6th Cir.1996). "When defendants are acting under color of state law, these arguments are raised as § 1983 claims." *Schwartz,* at 6. Thus, for the same reasons Plaintiffs' due process claim fails, their abuse of power claim fails, because the two are analyzed similarly. Because Ohio law affords sufficient due process, Plaintiffs' abuse of power claim fails.

Therefore, because Plaintiffs have not shown the violation of a constitutional right, nor have they established that any right to having a horse run in a particular race was a clearly established constitutional right, Defendants Gore, Parker and DeLuca are entitled to summary judgment on all Plaintiffs' claims.

**Thistledown**

Defendant Thistledown Racetrack LLC moves for summary judgment on Plaintiffs' remaining claims for Breach of Contract, Defamation and False Light. For the following reasons, the Court grants Defendant's Motion on all Plaintiffs' claims against it.

Plaintiffs allege that Defendant Thistledown may be sued for breach of contract on the theory that when Defendant Thistledown granted stall spaces, they also implicitly guaranteed a certain number of races for Plaintiffs. Plaintiffs further allege Defendant Thistledown dispersed disparaging information to other race tracks regarding the discovery of

*High Success* at Sugar Creek, that Plaintiffs were barred from racing at other tracks because of that and bring a defamation and false light suit against Defendant Thistledown.

**1. Contract**

According to Plaintiffs' SAC, Defendant Thistledown's Stall Application of 2012 created a contractual obligation to board Plaintiffs' horses. By suspending Plaintiffs' track privileges without cause, Thistledown breached the boarding agreement.

At issue is the Stall Application signed by Benjamin Mumaw. The stated purpose of the Stall Application is to assure "the availability of horses that, in the sole opinion of Thistledown Management, will produce the best race meeting. Stall on Thistledown's premises are offered solely as an accommodation to owners or trainers that race exclusively at race meetings conducted by Thistledown." (Stall application pg.2 para 2).

Under Ohio law, the elements required for a breach of contract claim are: 1) the existence of a valid contract; 2) performance by the plaintiff; 3) breach by the defendant; and 4) damage or loss to the plaintiff. *Res. Title Agency, Inc. v. Morreale Real Estate Servs., Inc*., 314 F.Supp.2d 763, 769 (N.D. Ohio 2004). When interpreting the terms of a contract, it is the primary purpose of a court to give effect to the intent of the parties, which may be presumed to lie in the language that the parties used. *Swain v. Wells Fargo Bank, N.A.*, 54 F. Supp. 3d 850, 856 (N.D. Ohio 2014). Under Ohio law, language is considered ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *U.S. Fid. & Guar. Co. v. St. Elizabeth Med. Ctr*., 129 Ohio App.3d 45, 55, 716 N.E.2d 1201 (1998). In Ohio, a party is bound to the terms of a contract absent the presence of fraud or deceit. *Stout v. J.D. Byrider*,

228 F.3d 709, 715 (6th Cir. 2000).

Defendants argue that Plaintiffs' breach of contract claim fails for a number of reasons. First, only Benjamin Mumaw signed the contract, therefore, Joshua Mumaw and Eyes of a Child Stables lack standing to assert any breach of contract claims. Second, Thistledown fully performed its only contractual obligation under the Stall Agreement by providing stall space for the 2012 racing season. Benjamin was not denied stall space for the term of the agreement; he only vacated when everyone else vacated. (B, Mumaw 201:7-10). The Stall Agreement does not guarantee any signatory a right to race horses at Thistledown. There is no ambiguity and the plain language only guarantees a right to stable, not race horses.

Horses could race at Thistledown that were not stabled there. In fact, Thistledown points out that *Officer Moo La Moo,* Plaintiff's horse that was scratched from a race, was not stabled at Thistledown. Thistledown refers the Court to Benjamin Mumaw's deposition where he acknowledged that "the Stall Application is strictly to retain stalls so you might race at Thistledown." (Id at 202:15-24). He further acknowledged that he knew of no racetrack in the United States that in its stall application includes language guaranteeing a right to race. (Id. At 19). There is no dispute Thistledown has the right to exclude entries for races under the Ohio Administrative Code and common law. Thus, for these reasons, Defendants move the Court for summary judgment on Plaintiffs' breach of contract claims.

Plaintiffs oppose the Motion, contending that although there was no requirement that an owner or trainer have a stall agreement to race at Thistledown, once an owner or trainer had a stall application accepted they were contractually obligated to race at Thistledown. The Stall Application set a benchmark number of races per month. Plaintiffs rely primarily on the

clause: "The benchmark for Trainers is that they should maintain a 1-1.5 starts per stall per month during racing season to keep allotted number of stalls. Also, you must have a minimum of five horses to get a tack room." (Stall Application pg. 1 para 4). Plaintiffs further cite the purpose of the Stall Application was to ensure that, in the opinion of Thistledown, there would be sufficient availability of horses to produce the "best race meeting" and to encourage "Full Fields." The Stall Application also required that horses stalled at Thistledown race strictly at Thistledown. Lastly, Plaintiffs rely on the Stall Application requirement that No Maidens over Five Year-Olds will be allotted stalls and Horses which have not finished 1, 2, 3 or 4 for 4,000 or less in their last (8) starts will not be eligible for stall space." These clauses impose, in the opinion of Plaintiffs, the requirement that horses stalled at Thistledown not only race but must be successful in those races.

Having considered the motion, opposition and reply along with the supporting exhibits, the Court finds there are no genuine issues of fact and Defendant is entitled to summary judgment on Plaintiffs' breach of contract claim.

The Court finds Plaintiffs' breach of contract claim fails for several reasons. First and foremost, the Stall Application does not oblige Thistledown to provide Plaintiffs a fixed amount of races. The operative words in this clause are 'benchmark' and 'should.' The plain meaning of these words is that they are targets or goals with room for variance, not a requirement. This is further reinforced by the fact that they are immediately contrasted by the word 'must.' The contract does not require that Defendant Thistledown provide a set number of races. Furthermore, the onus is placed not on Thistledown, but on the trainer to maintain 1 to 1.5 starts per horse per month. Thus, the contract is silent concerning the right to race or the

right to a certain number of races at Thistledown.

Second, the Stall Application expressly states the purpose of stalling horses at

Thistledown:

> The granting of stall space at THISTLEDOWN is for the purpose of assuring
> the availability of horses that, in the sole opinion of THISTLEDOWN
> Management, will produce the best race meeting.  Stalls on Thistledown's
> premises are offered *solely as an accommodation* to owners or trainers that
> race exclusively at race meetings conducted by THISTLEDOWN (emphasis
> added).

Again, nothing in the Contract guarantees that Plaintiffs are entitled to anything more

than accommodations to race at Defendant Thistledown's race track.  Plaintiffs were

accommodated for the racing season.  At no point was that accommodation revoked.  If, for

example, Defendant Thistledown had prevented Plaintiffs from racing *and* invoked their starts

per stall standard to revoke the agreement, then Plaintiffs' argument might hold weight.

Plaintiffs were given races and thus the stalls operated as accommodations.  Just because

Defendant Thistledown may or may not have given the suggested number of races for a single

month does not mean the Contract was violated.

Plaintiff Benjamin Mumaw acknowledged in his deposition that trainers were not

required to stable horses at Thistledown in order to race there.  (Benjamin Mumaw depo.at

203:3-5) and further acknowledged the purpose of the Stall Application was "strictly to retain

stalls so you might race at Thistledown."  There is no ambiguity in the Stall Application and it

was solely to accommodate owners and trainers who race at Thistledown.[2]   It was not a racing

---

[2]     Plaintiffs' argue that any ambiguities to the contract should be construed against
Thistledown as the drafter of the Stall Application, yet Plaintiffs fail to identify
any ambiguities in the Stall Application.

contract.

Third, the purpose of the Stall Application is the stabling of horses and the penalty for violating any terms of the Stall Application is loss of the stall. Because Plaintiffs have not alleged nor offered evidence that Defendant's alleged breach caused them to lose their rights to a stall, the breach of contract claim fails. In fact, the Mumaws concede in their deposition that their stall rights expired when everyone elses did and not as a consequence for any breach.

Thus, because Defendant Thistledown did not violate the Contract, Plaintiffs have no claim upon which relief may be granted. The Court grants the Motion for Summary Judgement on Plaintiff's claim for breach of contract and Plaintiff's claim for consequential damages.

### 2. Defamation

Plaintiffs also assert a Defamation claim against Thistledown, contending that when Thistledown suspended the track privileges of Plaintiffs it "advertized to all the world that Plaintiffs engaged in improper or unlawful activity by selling or attempting to sell a horse for slaughter and human consumption." (SAC at para 139). The SAC further alleges Thistledown company officials conveyed to others that Plaintiffs had consigned or were directly responsible for the consignment of the horse known as *High Success* to a public auction for the purpose of slaughter and human consumption, thereby defaming Plaintiffs. (Id at 143).

In order to prove defamation, a plaintiff must show:

> (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.

*Anthony List v. Driehaus*, 779 F.3d 628, 632–33 (6th Cir. 2015) (internal quotations omitted).

A court is not required "to credit a complaint's conclusory statements without reference to its factual context." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 (2009). "Defamatory publications, standing alone, do not rise to the level of a constitutional claim, no matter how serious the harm to reputation." *Mertik v. Blalock*, 983 F.2d 1353, 1362 (6th Cir. 1993)

Plaintiffs essentially allege that secret backdoor communications occurred behind closed doors and Thistledown's sharing information with other Ohio racetracks led to those racetracks banning Plaintiffs. Despite four years of litigation, Plaintiffs have provided no evidence that Thistledown themselves ever made a statement or publication that defamed Plaintiffs. Thistledown came to its own conclusion on the basis of its own investigation and it is within its rights to bar Plaintiffs on this basis.

Plaintiffs allege that Thistledown falsely stated that Plaintiffs owned *High Success* at the time that the horse appeared at auction. Yet, Plaintiffs themselves admit that they still possess the title paperwork for *High Success* and that no transfer of ownership except the physical transportation of the horse transpired. Plaintiffs challenge Defendant's assertion that *High Success* was at the Sugar Creek auction house, however, that claim is directly contradicted by affidavits and photos from Defendants. Plaintiffs have provided no proof beyond mere denials that *High Success* was never there. Plaintiffs also allege that characterizing the auction as a slaughterhouse is a false statement. Almost every person involved in this case with knowledge of the auction house, including Plaintiff Benjamin Mumaw, agrees that the auction house is substantially related to horse slaughter. Unless Plaintiffs can point to Defendant's lies knowingly or recklessly spread to third parties, Plaintiffs have not met the requisite standard for pleading or proof.

In fact, Plaintiffs all stated they had no personal knowledge that Thistledown reported to the world that Plaintiffs sent horses to slaughter. (B. Mumaw depo at 117) (J. Mumaw at 198-199) (Schefft at 76.) Thistledown offers evidence it only conveyed the basis for Plaintiffs' racing suspension to Plaintiffs personally and privately. Merely scratching *Officer Moo La Moo* from a race without informing third parties of the basis for it is not a defamatory communication. As Thistledown further asserts, horses are scratched from races frequently for a variety of reasons, including the health of the horse and scratching Plaintiffs' horse would not have caused any inference of impropriety be placed upon Plaintiffs.

Plaintiffs cite to the deposition of Steward Joel McCuller, wherein McCuller stated he had conversations with Deborah Jones about the Mumaws, but testimony clearly demonstrates it was Jones who told Thistledown that the Mumaws had sent horses to Sugar Creek. McCuller testified he only told her they were investigating her allegations. As McCuller testified, "that's all I could tell her." (McCuller depo pg. 14). Thus, Plaintiffs have failed to offer any evidence showing Thistledown advertized to the world that the Mumaws sent horses to slaughter.

Furthermore, Plaintiffs offer no response to Defendant's assertion it had a conditional privilege to communicate the scratching of horses and banning of owners or trainers through its InCompass system, nor can they dispute that the nature of what was communicated via the system - i.e.- that Plaintiffs horse was scratched and Plaintiffs were no longer allowed to race at Thistledown, were indisputably true statements.

In sum, Plaintiffs provided nothing but conclusory allegations of defamation by Thistledown. Plaintiffs fail the first prong of a defamation suit and as a matter of law,

Plaintiffs have failed to present a prima facie case for defamation. The Court finds that Summary Judgment is appropriate on this count.

### 3. False Light

False light invasion of privacy may be brought as a suit if:

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Murray v. HuffingtonPost.com, Inc.*, 21 F. Supp. 3d 879, 884 (S.D. Ohio 2014).

"Initially, to establish a claim of false light invasion of privacy, [a plaintiff] must prove that the statements which have attracted publicity are untrue." *Michael v. Javitch, Block & Rathbone, LLP*, 825 F. Supp. 2d 913, 923 (N.D. Ohio 2011). Under Ohio law," a party need only show that the statement is substantially true...Even if the statement could be construed as defamatory, the truth defense still prevents it from being actionable. *Roth v. Sloan*, No. 1:08 CV 1656, 2011 WL 1627932, at *7 (N.D. Ohio Apr. 29, 2011).

For the same reasons that their defamation claim fails, Plaintiffs' false light claim fails, because they cannot show a false statement was made or conveyed to third parties.

According to Plaintiff Joshua Mumaw, the Plaintiffs initially approached the Stewards at Thistledown. Thistledown gave Plaintiffs the opportunity to present their case to the Stewards, where they found Plaintiffs' explanations inadequate. Plaintiffs have not pointed to any statements, true or false, actually made by Thistledown about Plaintiffs. Plaintiffs have only made the assumption that false statements were circulated by Thistledown to other racetracks. *The NY Times* article in question makes no mention of the Plaintiff. Joe Drape, *Rescuing Racehorses as an Industry Bides Its Time*, N.Y. Times, Nov. 2, 2012, at B9. It

simply factually mentions that a horse that raced at Thistledown was found at a known slaughterhouse auction.  It is a fact that a racehorse under the Plaintiff's name ended up at an auction house that sells to slaughterhouses.  It is a fact that *High Success* raced at Thistledown a few weeks prior. Thistledown even gave Plaintiffs an opportunity to explain themselves and found those explanations implausible.

Thus, the statement s made by Thistledown are substantially true.  Despite denials by Plaintiffs, the uncontested evidence is that a horse that recently raced at Defendant Thistledown and registered to Plaintiffs was found at an auction known to be associated with slaughterhouses.  Furthermore, the paperwork for the ownership of the horse was possessed by Plaintiff Joshua Mumaw.  Thistledown is well within its rights to conclude that the Plaintiffs were indirectly involved in horse slaughter and did not make such an inference on the basis of false information.  Likewise, Thistledown did not broadcast any information to other parties.  Because the information that Thistledown relied on is substantially true, the Court finds that Plaintiffs' false light claim fails as a matter of law and Summary Judgment is granted for Thistledown on Plaintiffs' defamation and false light claims.

**Deborah Jones**

Plaintiffs' allege defamation and false light claims against Jones in two ways.  First, that Jones' calls to Thistledown were defamatory or in a false light.  Second, that Jones' posts on Facebook were defamatory or portrayed Plaintiffs in a false light.  As relates to Jones, Plaintiffs' SAC alleges that in the fall of 2012, a veterinary exam revealed *High Success* had a leg injury that prevented it from racing.  The Mumaws gave *High Success* to a woman seeking a riding horse for her children.  A few weeks later, Plaintiffs were contacted by Deborah Jones,

an animal rights activist in California, who informed them *High Success* was discovered at an

auction and was purchased by a third party to prevent *High Success's* sale for slaughter. Jones

demanded money to help support *High Success* and reported the sale to Thistledown officials

and Racing Stewards. The Racing Stewards then scratched Mumaw horses from all races and

prohibited Plaintiffs from entering other horses owned or trained by them from any further

races in 2012. Thistledown suspended certain track privileges of the Mumaws, including their

ability to participate in any races. These actions were based on Thistledown's Boarding

Agreement, which prohibited the transportation from the Racetrack of any horse for the

purpose of slaughter.

According to the SAC, Jones defamatory statements included the following:

7. This is an action seeking damages against the Defendant Deborah Jones for engaging in a pattern of extortionary tactics and blackmail by demanding that the Plaintiffs pay monies or face a public smear campaign and the lodging of false accusations with the Ohio State Racing Commission and Thistledown Racetrack officials and the public at large designed to disrupt and destroy their careers. Defendant Jones also slandered and libeled Plaintiffs and cast a false light upon them by making various claims and accusations against Plaintiffs, all of which she knew to be false and misleading, on various online websites.

39. Defendant Deborah Jones contacted the Racing Stewards at Thistledown Racetrack and corporate officials of Thistledown and falsely claimed that Joshua and Benjamin Mumaw had a horse at Sugar Creek Livestock Auction named *High Success*.

164. When Plaintiff refused her demands, Defendant Deborah Jones called the Board of Stewards for the Ohio Racing Commission and officials of Thistledown Racetrack and claimed that Plaintiff had sold the horse *High Success* at Sugar Creek Livestock Auction for slaughter.

165. Defendant made calls repeatedly and incessantly with the intent to cause injury to Plaintiffs' careers and good standing in the industry.

**1. Communications Between Defendant Jones and Defendant Thistledown**

The Court finds that Jones is entitled to summary judgment on Plaintiffs' claims of defamation with respect to Jones' calls to Thistledown. Plaintiffs have not presented any evidence that Jones provided false or misleading information to Thistledown. Jones informed Thistledown that a horse that had recently raced at the track was found at a known slaughter auction.[3] Thistledown gave Plaintiffs a chance to defend themselves and Thistledown drew its own conclusions from the facts presented. These uncontested facts demonstrate *High Success* was owned by Plaintiffs based on the registration papers and that *High Success* was found at the Sugar Creek auction; an auction that sells a least some horses to slaugherhouses. Thus, Thistledown, with no reliance on a false statement, determined that Plaintiffs' version of events was implausible and Plaintiffs' conduct violated the Stall Agreement. As a result, Plaintiffs' allegations fail the substantial truth test of false light and the first portion of the defamation test. With respect to Jones' phone calls to Thistledown, the Court finds Summary Judgment appropriate.

### 2. Facebook Posts

Likewise, the Court finds that Plaintiffs have not met their burden of meeting the elements of defamation or false light for Jones Facebook posts. Plaintiffs have not provided sufficient evidence to establish a genuine issue of material fact that Plaintiffs suffered an injury as a result of Jones' Facebook posts. Plaintiffs have admitted that they were the first to approach Thistledown with regards to the presence of one of their horses at an auction block

---

[3]     Though Plaintiff oscillates between admitting that the horse was found at the auction block and refuting it was ever there, the Plaintiffs have not provided any evidence beyond denials. This is directly contradicted by significant evidence from the Defendants.

commonly used for horse slaughter. Additionally, Plaintiffs have not provided sufficient evidence that Jones made a false statement of fact or that she misled Thistledown into falsely believing that Plaintiffs were indirectly involved in the horse arriving at auction. Jones' Facebook communications were substantially true. [4]

Plaintiffs contend that Jones' characterization of Plaintiff's practice of racing horses under another trainers name as a "hidden ownership scheme" is not true. However, the Stewards determined it was an attempt to do an end around on Plaintiffs suspension. Racing horses under the name of another could certainly be considered an obfuscation of ownership and therefore Jones' comments were not misleading nor false. Nor are Jones' statements regarding *High Success* appearing at an auction - an auction that Plaintiff has admitted as being closely tied to horse slaughter - substantially false. What is more, at no point in the Facebook posts or in the New York Times article did Jones assign blame to Plaintiffs. Jones cannot be held accountable for readers reactions to this information, just as she cannot be held accountable for Thistledown's conclusions based on her information. Therefore, the Court finds Jones is entitled to Summary Judgment.

## CONCLUSION

---

[4]     In its Opinion and Order on Defendant Jones' Motion to Dismiss, the Court determined Plaintiffs' Second Amended Complaint stated sufficient facts supporting its defamation and false light claims arising out of Jones's telephone calls and Facebook posts concerning *High Success's* presence at the Sugar Creek auction. Plaintiffs' never asserted any facts supporting a defamation claim or false light claim regarding Jones's calls or posts about Plaintiffs' hidden ownership issues and Plaintiffs cannot now assert such claims when they were never plead with sufficient facts to support them and the Court did not allow them to proceed on such a theory. The law of the case precludes the late argument of such a theory.

For the foregoing reasons, the Court GRANTS the Defendants' Motions for Summary Judgment on all Plaintiffs' remaining claims.

IT IS SO ORDERED.

s/ Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge

Dated:  September 29, 2017